Leon B. Pullen and Faye Pullen v. Commissioner.
Pullen v. Commissioner
Docket No. 92206.
United States Tax Court
T.C. Memo 1963-20; 1963 Tax Ct. Memo LEXIS 324; 22 T.C.M. (CCH) 78; T.C.M. (RIA) 63020; January 24, 1963
*324 Held, petitioner Leon B. Pullen was not a dealer in securities and was not holding the stock of Central American Life Insurance Company, of which company he was president, primarily for sale to customers in the ordinary course of his business, which stock he sold to P & R Investors, Inc., in four sales in 1957, 1958, and 1959 for the purpose of reducing his loans to the bank and which stock was up as collateral security to the bank. The gains from such sales represent capital gains to petitioner and not ordinary income. Held, further, petitioner has not established that he is entitled to deduct traveling expenses in an amount greater than that allowed by respondent. Ronald M. Mankoff, Esq., and Wentworth T. Durant, Esq., 2323 Fidelity Union Tower, Dallas, Tex., for the petitioners. Roy E. Graham, Esq., for *325 the respondent. BLACK Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax against petitioners for the years 1957, 1958, and 1959 in the respective amounts of $2,168.51, $70,372.19, and $32,789.82. In his statutory notice of deficiency respondent made adjustments to income for 1957, 1958, and 1959, disallowing petitioners capital gains treatment on the sale of stock. The explanation of adjustments for 1957 is as follows: (a) It is determined that the gain realized on sales of Central American Life Insurance Company stock to P and R Investors, Inc., which you organized in 1957 and of which you owned more than 95 percent of the stock, and the gain realized on sales of Central American Life Insurance Company stock by P and R Investors, Inc., to the public represents ordinary income to you. It is further determined that P and R Investors, Inc., acted as your agent in selling the stock to the public. Your income is increased by $6,768.54 computed as follows: Sales of Central American Life
Stock
$12,500.00
Less: Cost of sales; see
Exhibit A
$5,680.80
Expenses (net);
see Exhibit B
50.66
5,731.46
$ 6,768.54
*326 (b) It has been determined that the sales of stock in item (a) is ordinary income to you; therefore, the amount of $1,972.68, which you reported as a long-term capital gain on sale of stock to P and R Investors, Inc., is eliminated from income. Similar adjustments and explanations for 1958 and 1959 were made. Respondent also disallowed travel expense deductions of $2,397.50 for 1958 and $1,509.67 for 1959 with the following explanation presented for 1958: (b) In the absence of records or other data substantiating the items included in the deduction of $4,897.50 claimed as travel expense, it is determined that $2,500.00 represents a reasonable allowance therefor under the internal revenue laws and the remainder, or $2,397.20, is disallowed. A similar explanation was presented for 1959. The issues presented are: 1. Did the petitioners receive ordinary income or capital gains from the sale of Central American Life Insurance Company stock during the taxable years 1957, 1958, and 1959? 2. Are the petitioners entitled to additional travel expenses of $2,397.50 for 1958 and $1,509.67 for 1959? Findings of Fact Leon B. Pullen, hereinafter called petitioner, and Faye Pullen *327 are husband and wife residing in Lubbock, Texas. Their income tax returns for the calendar years 1957, 1958, and 1959 were filed with the district director of internal revenue, Dallas, Texas. Faye is involved herein by reason of having filed joint returns with her husband. Petitioners' tax returns for 1957, 1958, and 1959 reflect the cost bases, holding periods, and sales prices of stocks sold by him during those years to P & R Investors, Inc., hereinafter called P & R. Petitioner has been in the life insurance business almost continuously since 1934. In the fall of 1949, he came to Lubbock, Texas; he married Faye in the following year. During 1951, petitioner and his brother formed the Central American Life Insurance Company of Lubbock, Texas, hereinafter called Central American. During the formation and growth of Central American petitioner devoted all of his working time, performing all of the functions relating to the insurance company and the maintenance of its office and records. In 1953, Central American was merged with Citizens' Security Life Insurance Company for the purpose of giving Central American the status of a full capital company which could sell insurance policies *328 without limit. In 1953, petitioner borrowed $167,350 from Citizens National Bank of Lubbock, Texas, hereinafter called the Bank, to buy all outstanding stock of Citizens' Security Life Insurance Company. During 1953, petitioner borrowed an additional $23,020 from the Bank to make a payment of income taxes. From 1951 through 1957, petitioner's primary source of income was his salary from Central American. In 1956 or 1957, petitioner's salary was raised to $30,000 per year and has remained as such until the time of the hearing. From 1951 to the time of the hearing petitioner was president and agency manager of Central American. From 1953 through 1956, petitioner purchased stock of individual shareholders of Central American when the shareholders desired to sell and could find no other buyer for the stock. During this period petitioner purchased approximately 600 shares of Central American, obtaining the funds from the Bank. In 1957, there was a 10 for 1 split in the stock of Central American. After the stock split, the stockholders were given an option to purchase 1 share of Central American stock for $20 for each 10 shares of Central American stock held. The purpose in allowing *329 the stockholders to purchase 1 share of Central American stock for $20 for each 10 shares owned was to obtain money to retire Central American's outstanding debenture bonds. Petitioner, in view of his ownership of stock in Central American, was given an option to purchase 6,000 shares of Central American for $20 per share. He borrowed $120,000 from the Bank and bought 6,000 shares. There were also some 800 shares of option stock not purchased by other stockholders and petitioner again borrowed money from the Bank and bought this stock. This gave petitioner approximately 60 percent of the outstanding stock of Central American. Petitioner's loans were secured by Central American stock. In 1957, petitioner borrowed $200,000 from the Bank. This $200,000 would have put petitioner's account up to $465,000 which was in excess of the loan limit of the Bank to one borrower; therefore, a part of this loan was farmed out to a Fort Worth, Texas, bank. The major portion of petitioner's loans from the Bank was attributable to buying stock. Petitioner's bank loans were secured with his Central American stock. When petitioner received the $200,000 loan, the Bank told him he would have to start reducing *330 his indebtedness. Petitioner talked with his attorneys about selling stock to pay off the loan. The Bank advised petitioner not to publicly disclose his sales of Central American stock for fear such disclosure would affect the confidence of the public in the company and impair the value of the Bank's collateral. The Bank recommended that a corporation be formed and that petitioner sell his stock to it privately. On July 5, 1957, P & R Investors, Inc., was formed as a Texas corporation. P & R's stated purposes were: "to accumulate and lend money and to purchase, sell, and deal in notes, stocks, bonds and other securities, but without banking privileges." Petitioner initially subscribed to 99.8 percent of P & R's capital stock. P & R's sales of its authorized but unissued stock reduced petitioner's interest in March 1959 to 54.923 percent; in September 1959, his interest was similarly reduced to 50.98 percent; and in November 1959, P & R's sale of newly authorized stock reduced petitioner's interest to 12.348 percent. Petitioner was an original officer of P & R and thereafter periodically served as an officer. On September 9, 1957, petitioner made one sale of 5,006 shares of *331 Central American stock to P & R for $30 per share, payable 5 percent in cash and the balance in two annual installments bearing 5 percent interest. On April 30, 1958, petitioner made one sale of 6,400 shares of Central American stock to P & R for $30 per share evidenced by a 2-year note bearing 5 percent interest. On July 8, 1959, petitioner made one sale of 1,081 shares of Central American stock to P & R for $31.50 per share, paid in cash. On September 17, 1959, petitioner made one sale of 1,360 shares of Central American stock to P & R for $32.50 per share, paid in cash. When petitioner sold the 6,400 shares of Central American stock to P & R in 1958 he lost the controlling interest in Central American which he never regained. P & R commenced doing business in 1957 out of its secretary's office in the Central American building. P & R profited by the rise in the value and price of Central American shares owned by it and by interest paid on its deferred sales contracts. P & R sold Central American stock for a small down payment and notes bearing interest at 6 percent per annum. P & R paid petitioner 5 percent interest on its purchase money notes and charged 6 percent interest *332 on its loans and deferred sales contracts. P & R held no license to sell stocks. P & R's sales of Central American stock and other stock which it owned from time to time were made only through licensed brokers and salesmen. P & R borrowed $218,775.39 from the Bank during 1959 solely for the purpose of exercising Central American stock options; of these loans, $10,275.39 was endorsed by petitioner and the balance was unendorsed. P & R now carries on the same business operation it has conducted since its inception. P & R has filed income tax returns for the fiscal years ended June 30, 1958, 1959, and 1960. Petitioner received $4,897.50 as purported travel expense reimbursement for Central American for the taxable year 1958. The Commissioner disallowed $2,397.50 of this expense claimed by petitioner as being unsubstantiated. In petitioner's income tax return for the taxable year 1959, he claimed travel expenses of $4,009.67 and the Commissioner disallowed $1,509.67 as unsubstantiated. Petitioner stated that he had been advised by a certified public accountant that unless he kept records of his travel expenses he would not be allowed to claim them. However, he did not keep such *333 records. Petitioner has presented no documentary evidence substantiating the claimed additional travel expenses of $2,397.50 and $1,509.67 for the taxable years 1958 and 1959, respectively. Opinion Issue 1 BLACK, Judge: The first issue in this case is whether or not petitioner was a dealer in securities and therefore not entitled to long-term capital gains treatment on his sales of Central American stock. [1]
*334 We have endeavored to make full Findings of Fact in the instant case and we do not think it is necessary to repeat them here at length. Suffice it to say, we do not think these facts show that P & R was a mere agent of petitioner as the Commissioner has determined in his deficiency notice. It was a corporation duly chartered under the laws of the State of Texas for business purposes stated in its charter. So far as we can see it has been operated within those purposes stated in its charter - it was still in business at the time of the hearing. Under the facts we cannot sustain respondent's determination in his deficiency notice that P & R acted merely as petitioner's agent. The Bank official who made loans for the Bank to petitioner in his purchases from time to time of Central American stock testified at some length at the hearing and made it plain that the Bank required petitioner to reduce his loans to the Bank and recommended to petitioner the organization of an independent corporation for the purchase and resale of some of petitioner's stock in Central American stock which was up as collateral security to the Bank. We think that this was one of the legitimate purposes for the *335 organization and operation of P & R and that it must be treated as a separate taxable entify and not as the mere alter ego of petitioner. See , affirming (C.A. 5, 1942). On this issue we hold for petitioner. Issue 2 The second issue presented is whether or not petitioner has established that he is entitled to additional travel expenses of $2,397.50 and $1,509.67 for 1958 and 1959, respectively, over that allowed by the respondent. Respondent has allowed $2,500 for each year as a reasonable allowance for travel. Petitioner did not maintain any records of claimed travel expenses. His testimony concerning these expenses was very general and in the absence of more specific testimony or other evidence we do not believe petitioner has met his burden of proof. We hold for the respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. Internal Revenue Code of 1954. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; * * *
(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); * * *↩